NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.   A-4139-13T3

HILL INTERNATIONAL, INC.,

    Plaintiff-Respondent,

v.

ATLANTIC CITY BOARD OF EDUCATION,

    Defendant-Respondent.

_____

COBRA CONSTRUCTION COMPANY, INC.,

    Plaintiff-Respondent,

v.

ATLANTIC CITY BOARD OF EDUCATION,

    Defendant-Respondent,

and

SOSH ARCHITECTS and PATRICK J.
GALLAGHER,

    Defendants/Third-Party
    Plaintiffs-Appellants,

v.

CZAR ENGINEERING,

    Third-Party Defendant/
    Fourth-Party Plaintiff-
    Respondent,

and

<div style="border:1px solid black; display:inline-block; padding:8px;">

**APPROVED FOR PUBLICATION**

**December 30, 2014**

**APPELLATE DIVISION**

</div>

ARTHUR W. PONZIO CO. & ASSOCIATES, INC.,

     Third-Party Defendant/
     Fourth-Party Plaintiff,

v.

CRAIG TEST BORING CO., INC., and
CRAIG TESTING LABORATORIES, INC.,

     Fourth-Party Defendants.

_____

Argued November 10, 2014 — Decided December 30, 2014

Before Judges Sabatino, Simonelli, and Leone.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-7252-12 and L-582-13.

Gary C. Chiumento argued the cause for appellants SOSH Architects and Patrick J. Gallagher (Chiumento McNally, L.L.C., attorneys; Mr. Chiumento and Ashley H. Buono, on the briefs).

Robert Hedinger argued the cause for respondent Cobra Construction Company, Inc. (Hedinger & Lawless, L.L.C., attorneys; Mr. Hedinger and Richard E. Wenger, on the briefs).

Kevin M. Bothwell argued the cause for respondent Czar Engineering (Thompson Becker & Bothwell, L.L.C., attorneys; Mr. Bothwell, of counsel and on the brief).

Richard W. Gaeckle argued the cause for amicus curiae AIA New Jersey, The New Jersey Society of Architects and The New Jersey Society of Professional Engineers (Hoagland, Longo, Moran, Dunst & Doukas, L.L.P., attorneys; Lawrence P. Powers, of counsel;

Andrew J. Carlowicz, Jr., and Mr. Gaeckle,
of counsel and on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This interlocutory appeal in a professional liability case poses more unsettled questions of law arising under the Affidavit of Merit statute, N.J.S.A. 2A:53A-26 to -29.

Specifically, the appeal concerns whether an affidavit of merit ("AOM") issued by a licensed engineer, which criticizes both the construction contract administration and design services provided by a licensed New Jersey architect and his licensed architectural firm, qualifies as an acceptable supporting AOM from an "appropriate licensed person" within the intended meaning of N.J.S.A. 2A:53A-27, even though the affiant is not also a licensed architect. More broadly, the appeal concerns whether, as defendants and amicus curiae argue, the statute should be construed to require a supporting AOM from a "like-licensed" professional in all malpractice or negligence cases within the scope of the statute.

For the reasons that follow, we hold that, to support claims of malpractice or negligence liability, the AOM must be issued by an affiant who is licensed within the same profession as the defendant. That like-licensed requirement applies even where, as is the case here in matters involving architects and

engineers, the relevant professional licensure laws overlap to some degree. An affidavit from such a like-licensed expert is not, however, required in circumstances where the plaintiff's claims are confined to theories of vicarious liability or agency and do not assert or implicate deviations from the defendant's professional standards of care.

Guided by this interpretation of the AOM statute, we conclude the trial court erred in ruling that an AOM issued by plaintiff's affiant, a licensed engineer, sufficed to support claims that alleged deviations of the professional standards of care by the defendant architect and his architectural firm.

Because our published opinion today on this novel issue might not have been readily predicted, and also because the trial court did not hold the required conference at which the claimed deficiency of the engineer's AOM could have been identified before the statutory 120-day maximum deadline for a proper AOM expired, we grant leave to plaintiff to submit, on remand, a substitute AOM from a licensed architect. The substitute AOM shall be furnished within a reasonable period of time to be specified by the trial court.

After discovery is completed, the trial court shall also consider, in the first instance, whether plaintiff's claims of intentional misrepresentation sufficiently implicate the

standards of care of an architect to require an architect's supporting AOM.

I.

A.

We begin with an overview of the key provisions within the AOM statute, which was first adopted in 1995 and was amended in 2004. In enacting this law, the Legislature aimed to strike "a fair balance between preserving a person's right to sue and controlling nuisance suits [against certain licensed professionals] that drive up the cost of doing business in New Jersey." L. 1995, c. 139, Statement of Governor Whitman on Signing S. 1493 (June 29, 1995).

Section 26 of the AOM statute, as amended and currently codified, enumerates various professions, including both architects and engineers, who are covered by its requirements:

> "Licensed person" defined
>
> As used in this act [N.J.S.A. 2A:53A-26 through -29], "licensed person" means any person who is licensed as:
>
> a. an accountant pursuant to [N.J.S.A. 45:2B-42 to -75];
>
> b. an architect pursuant to [N.J.S.A. 45:3-1 to -46];
>
> c. an attorney admitted to practice law in New Jersey;

5

d. a dentist pursuant to [N.J.S.A. 45:6-1 to -73];

e. an engineer pursuant to [N.J.S.A. 45:8-27 to -60];

f. a physician in the practice of medicine or surgery pursuant to [N.J.S.A. 45:9-1 to -58];

g. a podiatrist pursuant to [N.J.S.A. 45:5-1 to -20];

h. a chiropractor pursuant to [N.J.S.A. 45:9-41.17 to -32];

i. a registered professional nurse pursuant to [N.J.S.A. 45:11-23 to -67];

j. a health care facility as defined in [N.J.S.A. 26:2H-2];

k. a physical therapist pursuant to [N.J.S.A. 45:9-37.11 to -37.34f];

l. a land surveyor pursuant to [N.J.S.A. 45:8-27 to -60];

m. a registered pharmacist pursuant to [N.J.S.A. 45:14-40 to -82];

n. a veterinarian pursuant to [N.J.S.A. 45:16-1 to -18];

o. an insurance producer pursuant to [N.J.S.A. 17:22A-26 to -57]; and

p. a certified midwife, certified professional midwife, or certified nurse midwife pursuant to [N.J.S.A. 45:10-1 to -22].

[N.J.S.A. 2A:53A-26 (emphasis added).]

When such a licensed professional is sued for deviating from the standards of care applicable to his or her field of endeavor, the following requirements in Section 27 of the statute apply:

> In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of <u>malpractice or negligence by a licensed person in his profession or occupation</u>, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with <u>an affidavit of an appropriate licensed person</u> that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, <u>fell outside acceptable professional or occupational standards or treatment practices</u>. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.
>
> In the case of an action for medical malpractice, the person executing the affidavit shall meet the requirements of a person who provides expert testimony or executes an affidavit as set forth in [<u>N.J.S.A.</u>] 2A:53A-41. In all other cases, the person executing the affidavit <u>shall be licensed in this or any other state</u>; have <u>particular expertise in the general area or specialty involved</u> in the action, <u>as evidenced by board certification or by devotion of the person's practice substantially to the general area or specialty involved in the action for a period of at least five years</u>. The person shall have no financial interest in the outcome of the case under review, but this

> prohibition shall not exclude the person
> from being an expert witness in the case.
>
> [N.J.S.A. 2A:53A-27 (emphasis added).]

By its terms, the AOM statute "applies to all actions for damages based on professional malpractice." Ryan v. Renny, 203 N.J. 37, 50-51 (2010) (citing Charles A. Manganaro Consulting Eng'rs, Inc. v. Carneys Point Twp. Sewerage Auth., 344 N.J. Super. 343, 347 (App. Div. 2001)).

As Section 27 prescribes, the plaintiff pursuing such a malpractice case must file an affidavit from an "appropriate licensed person," stating with "reasonable probability" that the defendant's conduct "fell outside acceptable professional or occupational standards or treatment practices." N.J.S.A. 2A:53A-27. The plaintiff must do so within sixty days of the defendant's filing of an answer, and may receive an additional sixty-day extension only upon a showing of good cause. Ibid. Failure to file a suitable affidavit within the time period is generally deemed a failure to state a cause of action, subject to certain mitigating principles that have been recognized by the Supreme Court. See, e.g., Galik v. Clara Maass Med. Ctr., 167 N.J. 341, 350-59 (2000) (applying the doctrine of "substantial compliance" to excuse a plaintiff's failure to submit a timely AOM, where plaintiff had served the defendants' insurers with unsworn supporting expert reports before the

complaint was filed, and where plaintiff had taken a series of steps endeavoring to comply with the statute).

By requiring in Section 27 a supporting affidavit from "an appropriate licensed person" who attests to a "reasonable probability" that the defendant's conduct deviated from the relevant professional standards of care, the AOM statute is designed to thwart baseless lawsuits against professionals who practice in the categories of licensure listed in Section 26. Conversely, the statute permits cases to proceed if they have been duly screened by an eligible affiant who vouches that they have sufficient indicia of merit. See Burns v. Belafsky, 166 N.J. 466, 474 (2001) (citing Peter G. Verniero, Chief Counsel to the Governor, Report to the Governor on the Subject of Tort Reform (Sept. 13, 1994)).

The statute does not specify in a comprehensive or precise manner the qualifications of an "appropriate licensed person" who is eligible to submit an AOM, except for the more stringent specialization requirements imposed for affiants in medical malpractice cases in N.J.S.A. 2A:53A-41. Section 27, as noted above, does indicate that the affiant must be "licensed in this or any other state," and have "particular expertise in the general area or specialty involved in the action." N.J.S.A. 2A:53A-27; see also L. 1995, c. 13, § 2. The affiant may

establish such expertise either by a "certification" from a board, or by a showing of a "devotion of the person's practice substantially to the general area or specialty involved in the action for a period of at least five years." Ibid.

<center>B.</center>

The specific question raised before us is whether a licensed engineer, such as the one who was retained here by plaintiff, may qualify as such an "appropriate licensed person" in issuing an AOM against an architect or a licensed architectural firm, at least as to alleged deviations that fall within the zone of what the trial court described as an "overlap" in the licensure laws pertaining to architects and engineers. That legal issue arose here in the following factual and procedural context.

### The School Construction Project and the Parties

In early 2008, representatives of defendant-appellant SOSH Architects ("SOSH") and the Atlantic City Board of Education (the "School Board"), engaged in discussions for the construction of two new primary schools in Atlantic City. SOSH thereafter submitted to the School Board a "proposal for design services for these projects." To achieve that end, SOSH proposed to contract with several other firms as sub-consultants. Those firms included third-party defendants Arthur

W. Ponzio & Associates ("Ponzio"), which agreed to provide civil engineering services, and Czar Engineering ("Czar"), which agreed to provide structural engineering services. SOSH indicated to the School Board that its proposal "encompasse[d] all phases of work from Concept/Site Planning through Construction Administration."

In the fall of 2009, the School Board and SOSH entered into a contract for the design of the Richmond Avenue School.[1] Section 2.1.1 of that contract provided that "[t]he Architect's Basic Services consist of those described in Sections 2.2 through 2.6 and any other services identified in Article 12 as part of Basic Services, <u>and include normal structural, mechanical and electrical engineering services</u>." (emphasis added). Among other things, the contract obligated SOSH to provide schematic design documents, schematic design studies, design development documents, construction documents (consisting of drawings and specifications), and "administration of the [c]ontract for construction in cooperation with the Construction Manager."[2]

---

[1] The record on appeal does not contain a contract for the design of the second potential school building.

[2] The contract listed Hill International, Inc. ("Hill") as the project's Construction Manager. Hill is the plaintiff in a related separate lawsuit against the School Board consolidated
(continued)

Defendant-appellant Patrick J. Gallagher is an architect employed by SOSH who participated in the project. SOSH and Gallagher assert in their post-oral argument brief that they both are "registered architects" in New Jersey.[3]

The SOSH contract with the School Board further provided that "[t]he project shall be publicly-bid for a single-prime contractor." In early 2010, the School Board solicited construction bids for the construction of the Richmond Avenue School (the "Project"). Plaintiff-respondent Cobra Construction Company, Inc. ("Cobra"), a general contractor, won that bid. Soon thereafter, Cobra and the School Board entered into a

---

(continued)
with Cobra's present action. Hill was apparently procured by the School Board "for developing the project schedule and construction budgets and providing cost estimating throughout the development of these projects." Hill is not involved in SOSH's present interlocutory appeal.

[3] While Gallagher is a licensed architect in New Jersey, it is unclear from the record on appeal whether SOSH is a licensed architecture firm. In New Jersey, qualified architecture firms may obtain licenses from the State Board of Architecture, although they are not required to do so. See N.J.S.A. 45:3-17 to -19. In any event, it is undisputed that an AOM is needed to support plaintiff's malpractice allegations against SOSH as well as Gallagher. The dispute instead centers on the qualifications of the engineer that plaintiff chose to tender that affidavit.

construction contract for the Project on March 16, 2010, with a scheduled "substantial[] complet[ion]" date of August 24, 2011.[4]

Problems apparently arose during the course of construction. In particular, Cobra has alleged that the School Board, SOSH, and Gallagher "impeded and interfered" with its ability to complete the Project on schedule. These impediments allegedly included, among other things, "errors and omissions and lack of coordination and direction in the plans and specifications; failures to timely secure permits and approvals for the Project; failures to timely process Cobra's applications for payment; and failures to timely grant proper change order and time extension requests."

The School Board, SOSH, and Gallagher all deny these allegations. SOSH and Gallagher assert that the project delays were instead caused by Cobra, in not "commit[ting] sufficient men and material to the [P]roject, [and in failing] to schedule subcontractors and to build the [P]roject according to the approved plans and specifications."

In early 2012, SOSH and the School Board asserted that Cobra had fallen significantly behind in the course of

---

[4] The actual contract between Cobra and the School Board has not been supplied in the record on appeal.

construction. Thereafter, the School Board terminated Cobra's construction contract in a resolution dated April 13, 2012.

Cobra's Complaint and Defendants' Answers

In January 2013, Cobra filed a complaint in the Law Division against the School Board, SOSH, and Gallagher. The complaint alleged that the School Board breached the terms of its agreement with Cobra in removing Cobra from the Project. The complaint further alleged that SOSH and Gallagher wrongfully interfered and induced the School Board to breach the construction contract. It also alleged that the architect defendants negligently deviated from professional standards, both in the design of the Project and in the administration and oversight of the construction contract.

In relevant part, Cobra's complaint alleged in Count Five that:

> 51. [The School Board] entered into a contract with SOSH <u>whereby SOSH undertook</u> to provide for the benefit of the Project and the contractor, here Cobra, <u>certain design and oversight obligations</u>.
>
> . . . .
>
> 53. The aforesaid failures of SOSH on the Project, upon information and belief, constituted a <u>breach of its contractual undertaking</u> to the Board and to [the] third party beneficiary, Cobra.
>
> [(Emphasis added).]

Count Six alleged that:

> 57.  SOSH owed a <u>duty to Cobra to discharge its responsibilities in accordance with those standards of care generally recognized in the industry</u>.
>
> . . . .
>
> 59.  SOSH <u>negligently and carelessly</u> performed its duties, responsibilities, and obligations to the Project.
>
> 60.  A foreseeable result of such <u>negligence and carelessness</u> was that Cobra would be damaged, and Cobra has been so damaged as a direct and proximate result of same.
>
> [(Emphasis added).]

Count Seven repeated the allegations against SOSH contained in Count Six, this time against Gallagher, individually:

> 63.  Gallagher owed a duty to Cobra as the Project contractor to discharge his responsibilities <u>in accordance with those standards of care generally recognized in the industry</u>.
>
> . . . .
>
> 65.  Gallagher <u>negligently and carelessly</u> performed his duties, responsibilities and obligations to the Project.
>
> 66.  A foreseeable result of such <u>negligence and carelessness</u> was that Cobra would be damaged, and Cobra has been so damaged as a direct and proximate result of same.
>
> [(Emphasis added).]

In Count Eight, Cobra accused SOSH of intentional misrepresentations, alleging that:

15                                                    A-4139-13T3

69. SOSH also knew or should have known that <u>the project design documents it prepared were deficient as they contained numerous errors and omissions and further that its on-site administration services were being inadequately performed</u>.

70. To deflect responsibility from itself for such deficiencies and inadequate performance, SOSH by and through its representatives, undertook to make <u>misrepresentations to [the School Board] concerning Cobra's performance and to engage in a systematic pattern of conduct to orchestrate Cobra's termination</u>, in part, by permitting its on-site representative to execute a certification that <u>falsely represented</u> that sufficient cause existed for [the School Board] to terminate Cobra's contract.

71. The aforesaid actions by SOSH were <u>deliberate and intentional</u> and were calculated to cause harm to Cobra.

72. A foreseeable result of such <u>intentional</u> actions was that Cobra would be damaged, and Cobra has been so damaged as a direct and proximate result of same.

[(Emphasis added).]

Count Nine repeated these allegations of intentional misrepresentation against SOSH from Count Eight against Gallagher, individually.

In their joint answer, SOSH and Gallagher denied Cobra's allegations of their culpability. They also interposed an affirmative defense that plaintiff had not complied with the AOM statute. They further requested that the case be reassigned

from the Track II negligence case track to a Track III professional malpractice case. The court instead reclassified the case to Track IV, which is for certain complex matters, and extended the discovery period accordingly.

Engineer Beach's Affidavit of Merit

On March 18, 2013, a week after SOSH and Gallagher answered, Cobra filed and served a two-page Affidavit[5] of Merit from James R. Beach, P.E. (the "first Beach AOM").

Beach received a Bachelor of Science degree from the United States Coast Guard Academy in 1970, a B.S.C.E. (Bachelor of Science in Civil Engineering) from the University of Illinois in 1974, an M.S.C.E. (Master of Science in Civil Engineering) from Columbia University in 1977, and an M.B.A. from Rutgers University in 1984. He is a registered professional engineer licensed to practice as an engineer in the State of New Jersey, as well as in the states of Washington, New Hampshire, and New York. Beach is not, however, a licensed architect in New Jersey or in any other state.

Beach is affiliated with the Society of American Military Engineers, the American Association of Cost Engineers, the

---

[5] Although the first Beach AOM is in the form of a certification, defendants do not contend that form is improper. See R. 1:4-4(b).

Project Management Institute, the American Arbitration Association (as an Arbitration Panelist), and the American Society of Civil Engineers. From 1988 to 1995, he was an Adjunct Professor at the School of Architecture of the New York Institute of Technology, teaching undergraduate courses "related to structural design and construction management and supervision."

His curriculum vitae represents that Beach has extensive experience in construction claims evaluation and in the review and analysis of contractor schedules. He previously has been retained as an expert in litigation involving "delay claims, loss of productivity claims, project administration, damage calculations and project planning and scheduling." He has given numerous lectures on construction claims, construction scheduling, and project administration before the Project Management Institute and the American Society of Civil Engineers, among others.

With respect to the merits of Cobra's claims against SOSH and Gallagher, Beach attested in his first AOM that:

> It is my opinion that there exists a reasonable probability that the skill and care exercised and exhibited in the work of SOSH and Gallagher <u>with respect to certain design issues for the construction</u> of the Richmond Avenue School Project <u>and</u> with respect to <u>their conduct in their contract</u>

18

> administration responsibilities, fell outside acceptable professional standards.

> [(Emphasis added).]

Defendants' Motion To Dismiss

As we have noted, the AOM statute requires that the supporting affidavit be filed by a plaintiff within sixty days after the filing of a defendant's answer, subject to obtaining a court-approved extension of an additional sixty days. N.J.S.A. 2A:53A-27. In this case, because SOSH and Gallagher filed their answer on March 11, 2013, the total 120-day maximum statutory period ended on July 9, 2013.

Notably, for reasons that are not disclosed in the appellate record, the trial court did not conduct a case management conference before the AOM period expired, as is required by Ferreira v. Rancocas Orthopedic Assocs., 178 N.J. 144, 154-55 (2003). Ferreira mandates such conferences with the court in professional malpractice cases in order to remind a plaintiff's counsel of the need to provide a timely AOM, or, if an AOM has already been provided, to ascertain whether defense counsel have any objections to it. Ibid.

Fourteen days after the 120-day maximum period for an AOM had passed, SOSH and Gallagher moved to dismiss plaintiff's claims against them, on the basis that the first Beach AOM did not comply with the statute. Specifically, they argued that

Beach was an improper affiant because he was a civil engineer by training. They asserted that Cobra instead needed to file an AOM from a licensed architect, and that it was too late to do so.

In opposing the dismissal motion, Cobra argued that engineers and architects in New Jersey have overlapping areas of expertise and training, and, in some instances, are authorized to perform the same tasks. Given that overlap, Cobra maintained that Beach held the requisite credentials as a licensed engineer — one with considerable experience in matters of design and construction contract administration — to provide an AOM in support of its claims against SOSH and Gallagher.

To buttress its position, Cobra provided a second affidavit[6] from Beach (the "second Beach AOM") on August 14, 2013. That second AOM was accompanied by Beach's seventy-eight page expert report,[7] which, according to Cobra, substantiates the adequacy of

---

[6] Again, the second AOM was in the form of a certification.

[7] The report, which is entitled "Schedule Review & Delay Analysis," was originally prepared "for settlement purposes only" and focused largely on cost issues. Although the report is lengthy, much of it concerns an analysis of the delays associated with the construction on the Project, and the causes and impact of those delays. We make no comment on whether the opinions expressed in the report would be admissible under N.J.R.E. 701 against any of the named defendants at trial. Moreover, Cobra indicated at oral argument on appeal that it
(continued)

his first AOM.  In his second AOM, Beach clarified the scope of his review of the case as an expert:

> 5.  After Cobra's contract was terminated by [the School Board] by Resolution dated April 16, 2012, <u>I was retained by Cobra's attorney to review the circumstances surrounding the termination, to perform a schedule review and delay analysis and to determine what damages Cobra incurred as a result of the termination</u>.
>
> . . . .
>
> 7.  As can be seen from my report, I am critical of SOSH Architects and Patrick J. Gallagher <u>for their actions with regard to their administration of the construction on the project</u>.
>
> 8.  Specifically, Section III of my report, from pages 5 through 14, discusses the role of SOSH and Gallagher in causing [the School Board] to wrongfully terminate Cobra's contract.  <u>All this discussion involves the services provided by SOSH and Gallagher in their administration of the construction</u>.
>
> 9.  On pages 7 to 10 [of my report], I discuss <u>delay impacts</u> and events that are related to or <u>which emanate from project design errors or deficiencies and delayed performance by the architect</u>.
>
> 10.  However, each and every item that I identify in that section of my report <u>includes design issues that are engineering related and that are not just purely architectural.  Engineers and architects</u>

---

(continued)
anticipated securing another or an amplified expert report for purposes of discovery and trial.

> each can perform the design of structural
> and mechanical elements of a project.
>
> 11.   By way of example, Impact #2 on page 8
> involves <u>design changes</u> that were made to
> the <u>door hardware</u> and Impact #4 involves
> <u>design errors</u> for the installation of brick
> and CMU <u>where steel beams were not shown on
> the structural drawings</u>.
>
> . . . .
>
> 22.   <u>The claims against SOSH and Gallagher
> that involve design issues all involve
> either issues with the structural design or
> mechanical design and are within the purview
> of the practice of engineering</u>.
>
> [(Emphasis added).]

In addition, Peter J. DiBlasi, Cobra's Vice President, filed his own certification in opposition to defendants' motion, asserting that Cobra's allegations "arise out of the performance by these defendants of their construction administration responsibilities under SOSH's contract with [the School Board] and/or engineering services that were within the scope of SOSH's contract[.]"   DiBlasi added that Cobra's allegations "do not involve any claims against SOSH or Gallagher that involve services that were purely 'architectural.'"

<u>The Motion Judge's Decision</u>

After hearing oral argument, the trial court denied the architects' dismissal motion.   In his written decision dated December 16, 2013, the motion judge concluded that Beach was

qualified to provide an AOM in support of Cobra's professional malpractice claims against SOSH and Gallagher. In reaching that conclusion, the judge noted that there are overlapping areas of expertise between engineers and architects. Although not explicitly finding as such, the judge's decision implied that Beach's own personal areas of expertise overlapped with the architectural work performed by SOSH and Gallagher in this case.

The Present Appeal

SOSH and Gallagher moved for leave to appeal the trial court's AOM ruling. We granted that application. In the interim, SOSH and Gallagher filed claims as a third-party plaintiff against Ponzio and Czar, the engineering firms with whom SOSH had respectively contracted to provide civil engineering and structural engineering services for the Project.

Given the licensing-related issues germane to this case, we invited the Attorney General to participate in the appeal as counsel to the State Board of Architects and the State Board of Professional Engineers. The Attorney General declined our invitation. However, we did grant a joint motion of several professional groups, including AIA New Jersey, the New Jersey Society of Architects, and the New Jersey Society of Professional Engineers, to appear through a single law firm as amicus curiae. The amici join with SOSH and Gallagher in

23

advocating reversal of the trial court's decision. In addition, Czar has likewise filed a brief in support of reversal. None of the other parties to the litigation have elected to participate.

In now addressing these legal issues of statutory interpretation, we apply a de novo standard of review, affording no special deference to the trial court. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

## II.

### A.

The novel issues posed before us stem largely from the fact that the AOM statute does not contain a definition of an "appropriate licensed person," as that term is used in Section 27. Even so, we derive some interpretative guidance from the text and structure of Section 26. That definitional section enumerates the categories of licensed professionals and other entities whom the Legislature has designated to receive the protections of the AOM statute. Notably, Section 26 separately lists "architects" in N.J.S.A. 2A:53A-26(b) as one category of professionals, and then "engineers" in N.J.S.A. 2A:53A-26(e) in their own discrete category.

This separate designation of architects and engineers within Section 26, along with the fourteen other distinct listed categories, is consistent with the profession-specific licensing

laws that respectively govern those fields of endeavor. Although the statutes and regulations that respectively govern architects and engineers do acknowledge a degree of common ground between the two professions, they each have their own licensure requirements and core areas of practice.

The practice of architecture is regulated in this State by statute under N.J.S.A. 45:3-1 to -46, and by regulations set forth in N.J.A.C. 13:27-1.1 to -9.17. The licensing statute defines "architecture" as:

> the art and science of building design and particularly the design of any structure for human use or habitation. Architecture, further, is the art of applying human values and aesthetic principles to the science and technology of building methods, materials and engineering systems,[8] required to

---

[8] In this context, the architect licensing statute defines "engineering systems" as:

> those systems necessary for the proper function of a building and the surrounding site, the proper design of which requires engineering knowledge acquired through engineering or architectural education, training, or experience. These systems include but are not limited to structural, electrical, heating, lighting, acoustical, ventilation, air conditioning, grading, plumbing, and drainage. Drainage facilities for sites of ten acres or more or involving stormwater detention facilities or traversed by a water course shall only be designed by a professional engineer.
>
> [Ibid.]

comprise a total building project with a coherent and comprehensive unity of structure and site.

[N.J.S.A. 45:3-1.1.]

The licensure statute further explains that the practice of architecture entails:

the rendering of services in connection with the design, construction, enlargement, or alteration of a building or a group of buildings and the space within or surrounding those buildings, which have as their principal purpose human use or habitation. These services include site planning, providing preliminary studies, architectural designs, drawings, specifications, other technical documentation, and administration of construction for the purpose of determining compliance with drawings and specifications.

[Ibid. (emphasis added).]

A distinct professional board, the State Board of Architects, issues licenses to architects and regulates their activities within that profession. N.J.S.A. 45:3-1.1(d).

Likewise, the practice of engineering, and of related occupations such as land surveyors, is separately regulated by the State under N.J.S.A. 45:8-27 to -60, and by regulations codified at N.J.A.C. 13:40-1.1 to -15.23. In pertinent part, the Title 45 statute defines the practice of engineering to encompass:

any service or creative work the adequate performance of which requires engineering

A-4139-13T3

education, training, and experience and the application of special knowledge of the mathematical, physical and engineering sciences to such services or creative work as consultation, investigation, evaluation, planning and <u>design of engineering works and systems</u>, planning the use of land and water, engineering studies, <u>and the administration of construction for the purpose of determining compliance with drawings and specifications</u>; any of which embraces such services or work, either public or private, in connection with any engineering project including: utilities, structures, buildings, machines, equipment, processes, work systems, projects, telecommunications, or equipment of a mechanical, electrical, hydraulic, pneumatic or thermal nature, insofar as they involve safeguarding life, health or property, and including such other professional services as may be necessary to the planning, progress and completion of any engineering services. The design of buildings by professional engineers shall be consistent with section 7 of the "Building Design Services Act." [<u>N.J.S.A.</u> 45:4B-7].

[<u>N.J.S.A.</u> 45:8-28(b) (emphasis added).]

Notably, the engineering licensure statute expressly acknowledges the separate and distinct laws that regulate the practice of architecture:

The provisions of this chapter [concerning the licensure of engineers] <u>shall not be construed to prevent or affect the employment of architects in connection with engineering projects within the scope of the act to regulate the practice of architecture and all the amendments and supplements thereto</u>.

. . . .

> Nothing herein shall prohibit licensed <u>architects</u> from providing or offering services consistent with the "Building Design Services Act," [<u>N.J.S.A.</u> 45:4B-1 to -14].
>
> [<u>N.J.S.A.</u> 45:8-28(b) (emphasis added).]

A separate professional board, the State Board of Professional Engineers and Land Surveyors, regulates engineers. <u>N.J.S.A.</u> 45:8-30. Notably, engineers are prohibited by statute from advertising or describing themselves as a provider of "architectural services." <u>See</u> <u>N.J.S.A.</u> 45:4B-12.

By likewise categorizing architects in <u>N.J.S.A.</u> 2A:53A-26(b) separately from engineers in <u>N.J.S.A.</u> 2A:53A-26(e), Section 26 of the AOM statute acknowledges the distinct professional identities of licensed architects and of licensed engineers. Those distinct professional identities exist even though, subject to certain educational and examination requirements, some engineers are eligible to be additionally licensed as architects, <u>N.J.S.A.</u> 45:3-5.1, and some architects are eligible to be additionally licensed as engineers, <u>N.J.S.A.</u> 45:8-35.1.

Section 27 of the AOM statute fortifies this separation between the delineated professional categories in Section 26, insofar as Section 27 requires an AOM in an action for "malpractice or negligence by a licensed person <u>in</u> his [or her]

profession or occupation."  N.J.S.A. 2A:53A-27 (emphasis added).

Moreover, the affiant must support a "reasonable probability" that the defendant's conduct "fell outside acceptable professional or occupational standards[.]"  Ibid.

These "professional or occupational standards" referred to in Section 27 are logically the standards of care within the defendant's own licensed field of endeavor.  The statute does not say that the defendant may be evaluated under the standards of another profession, one in which he or she has not secured a license and for which he or she has not subjected himself or herself to the oversight of a different licensing board.

To be sure, there are numerous topical areas of overlap between the professions and occupations listed in Section 26, including, as the trial court found, between architects and engineers.[9]  The existence of such overlap as to certain tasks or

_____

[9] See, e.g., the Building Design Services Act ("BDSA"), N.J.S.A. 45:4B-1 to -14, which recognizes "an area of concurrent practice between the practice of architecture and the practice of engineering, specifically in the area of building design." N.J.S.A. 45:4B-2 (emphasis added).  See also N.J.S.A. 45:4B-7 (authorizing engineers to design certain kinds of buildings and structures, either fully or partially for specified "incidental use" categories, such as educational buildings in which an engineer may design no more than 10% of the building's total floor area or 2000 square feet, whichever is greater).  The BDSA further provides, with identical language, that both architects and engineers may perform the "administration of construction for the purpose of determining compliance with drawings and specifications."  See N.J.S.A. 45:4B-3(h) (as to architects) and
(continued)

functions that can be lawfully performed by more than one category of licensed professional does not, however, mean that an AOM from an expert holding a different category of professional license will pass muster.

A few simple examples readily illustrate the point. For instance, it would be contrary to the text and purposes of the AOM statute to allow a licensed nurse to serve as a qualified affiant against a licensed physician who, for example, negligently took and recorded a patient's blood pressure. Although nurses and physicians are both trained and authorized to take blood pressure readings, they are each still held professionally accountable under the standards of care of their own individual professions. It would thwart the screening objectives of the AOM statute to allow a nurse to vouch for a medical malpractice claim asserted against a physician, and vice-versa.[10]

---

(continued)
N.J.S.A. 45:4B-3(i) (as to engineers) (emphasis added). Despite these defined areas of overlap, the BDSA nonetheless declares the "Legislature's intent to provide for contracting between architects and engineers without compromising the integrity of either profession." N.J.S.A. 45:4B-2 (emphasis added).

[10] We reach that conclusion independently of the Legislature's 2004 amendments for affiants in medical malpractice cases. See N.J.S.A. 2A:53A-41. Those amendments imposed additional requirements regarding specialization to the licensing requirement in N.J.S.A. 2A:53A-27.

As a second example involving professional overlap, we consider the fact that both attorneys and accountants may prepare inheritance tax returns for clients. Such tax returns may involve a variety of complex matters that require professional skill and expertise, such as the valuation of a business. An attorney might negligently prepare such a tax return in a manner that produces errors, causing the client to sustain penalties or other financial harm. In such a situation, we doubt that the Legislature intended the AOM statute to allow a non-lawyer accountant to provide the supporting AOM against that lawyer in the client's legal malpractice suit. Instead, we construe the statute to require an approach of "to each his own."

Hence, even though the task of preparing the tax return could have been done by either a lawyer or an accountant, the standards of care for lawyers should be applied to the defendant lawyer. The legal malpractice claim therefore must be supported by an AOM from a qualified attorney, not from an accountant who is subject to his or her profession's own standards of care.

Construing the AOM statute to require such like-licensed affiants is consistent with norms of fairness as well as a recognition of the reasonable expectations of a licensed professional. A licensee practicing within his or her

A-4139-13T3

profession or occupation who makes a mistake and harms another person should reasonably anticipate that he or she can be held to account for that mistake by the professional board that has issued him or her a license to practice. The board may revoke, suspend, or otherwise take adverse action against the licensee, applying the profession-specific laws and regulations that are administered by that board. In addition, the licensee must fairly anticipate that he or she could be sued for malpractice by the injured party, upon proof that he or she strayed from the "acceptable . . . standards or treatment practices" within his or her profession or occupation. N.J.S.A. 2A:53A-27. The professional has a right to expect that those standards of care by which his or her conduct will be measured will be defined by the same profession in which he or she holds a license, and not by some other profession.

<div align="center">B.</div>

It is a fundamental canon of statutory construction that the words of a statute are to be read sensibly and reasonably, so as to carry out the apparent intent of the Legislature. Sussex Commons Assocs., L.L.C. v. Rutgers, 210 N.J. 531, 541 (2012). "Where a choice must be made between two imperfect interpretations, the view should be selected which more likely accords with the probable legislative intent." Cnty. of

<u>Monmouth v. Wissell</u>, 68 <u>N.J.</u> 35, 43 (1975).  In keeping with this objective, we concur with defendants and the amici in construing the AOM statute to require, subject to certain limitations and caveats that we shall discuss, <u>infra</u>, that the affiant be an expert who possesses the same category of professional license as the defendant.  Minor variations in the scope or terms of the respective licenses held by the affiant and the defendant that do not bear upon material issues in the case will not disqualify the affiant, so long as both professionals are licensed to practice within the same category of professionals listed in the sixteen subsections of <u>N.J.S.A.</u> 2A:53A-26.  A perfect match of credentials within the same license is not always required.

Assuming the affiant is such a like-licensed professional, the affiant must also satisfy the additional criteria of <u>N.J.S.A.</u> 2A:53A-27, requiring that the affiant have "particular expertise in the general area or specialty involved in the action," which can be established either by board certification or the affiant's devotion of a substantial amount of his or her practice to that relevant general area or specialty within the past five years.    <u>N.J.S.A.</u> 2A:53A-27.[11]    An affiant's

---

[11] In a medical malpractice case, the affiant must further satisfy the more stringent specialization requirements for
<div align="right">(continued)</div>

A-4139-13T3

satisfaction of the "particular expertise" requirement in Section 27 does not eliminate the need for the affiant to possess the same category of professional license as the defendant who has been sued. The "particular expertise" requirement is an additional, not an alternative, essential qualification.

We reject plaintiff's argument that Section 27's language providing the option of supplying an AOM from a person licensed in "any other state" means that the affiant can be someone who is licensed in a different profession than the professional who has been sued. N.J.S.A. 2A:53A-27. We recognize, as plaintiff has pointed out, architects or engineers in some other states cannot perform certain functions that they are authorized to perform in New Jersey. Conversely, the licensing laws of some states are less restrictive than our state in some respects, and allow architects or engineers to undertake professional tasks that they are not permitted to undertake here. But these cross-border differences do not justify a departure from the central concept in Section 27 requiring an AOM in an action for "malpractice or negligence by a licensed person in his [or her] profession or occupation." N.J.S.A. 2A:53A-27 (emphasis added).

_____

(continued)
physicians and other health care professionals set forth in N.J.S.A. 2A:53A-41.

The out-of-state status of a plaintiff's proposed affiant should not dilute a New Jersey professional's right to expect under our statutory scheme that he or she will be judged by the standards of his or her own profession, not some other profession. The plaintiff must find an affiant in New Jersey or another state within the defendant's same profession, as categorized in N.J.S.A. 2A:53A-26, to vouch for the merit of the lawsuit.

C.

Our endorsement of the "like-licensed" concept in interpreting and applying the AOM statute is subject to certain important limitations and caveats.

1.

First, as the statute and the case law instruct, no AOM will be required if the defendant professional's allegedly negligent conduct did not involve the exercise of functions within the scope of his or her licensed professional role. An AOM is required only if the alleged act is committed "by a licensed person in his [or her] profession or occupation." N.J.S.A. 2A:53A-27 (emphasis added).

We applied that rather obvious principle in Murphy v. New Road Construction, 378 N.J. Super. 238 (App. Div.), certif. denied, 185 N.J. 391 (2005), in which we vacated summary

35                                    A-4139-13T3

judgment the trial court had granted to an architectural firm, Cannon Group, which had been sued by a worker who had fallen off of a roof that was being repaired at a public school. Id. at 241-42. The construction management firm that was overseeing the project, New Road, did not have an architectural license. Id. at 240. Cannon Group prepared the architectural plans for New Road without a written contract. Ibid. During the course of the project, Cannon Group, "ostensibly at New Road's behest by way of discharging the latter's construction management contract responsibilities . . . had sent three retired Union roofers to perform inspection work" on the roof. Id. at 241. The dispatched roofers were assigned to ensure that a roofing contractor had "performed its job in compliance with its contract" with the school district. Ibid.

The trial court dismissed the injured plaintiff's claims against Cannon Group because he had not procured a supporting AOM from an architect. Id. at 239. We vacated that ruling because there were significant factual issues as to whether Cannon Group's involvement in the project comprised merely "separate functions in assisting the construction manager," as opposed to being part of Cannon Group's "responsibilities as an architect." Id. at 242-43. If they were the former, then no AOM was required.

Murphy thus illustrates the lack of need for an AOM when the defendant's conduct does not implicate the standards of care within the defendant's profession.  In a similar vein, an AOM is not required when a plaintiff's allegations against a professional are based upon "common knowledge" and do not require proof of a deviation from a professional standard of care.  Triarsi v. BSC Grp. Servs., L.L.C., 422 N.J. Super. 104, 116-17 (App. Div. 2011).

## 2.

A second exception to the general need for an AOM from a like-licensed professional arises when a plaintiff's claims against the professional do not sound in malpractice or negligence but instead rest on other discrete theories of liability.[12]  N.J.S.A. 2A:53A-27 only requires an AOM in civil actions "for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation[.]"  (Emphasis added).  See also Ryan, supra, 203 N.J. at 50-51.

Hence, if a licensed professional deliberately hurts a client or patient in an office fistfight, or purposefully

---

[12] For instance, breach of contract claims may not require an AOM.  Couri v. Gardner, 173 N.J. 328, 334-41 (2002).

spreads falsehoods on the Internet about a former client who refuses to pay the professional's bill, an AOM will not be required to support claims against that professional for the intentional torts of assault and battery or defamation. Such intentional wrongdoing is outside of the sphere of professional malpractice litigation that the AOM statute is designed to regulate. However, if the claim's "underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession," an AOM is required for that claim. Couri, supra, 173 N.J. at 340.

3.

Third, the requirement of an AOM from a like-licensed professional will not apply if the plaintiff's claims are strictly confined to theories of vicarious liability or agency that do not implicate the standards of care of the defendant's profession. This principle is illustrated by our decision in Borough of Berlin v. Remington & Vernick Engineers, 337 N.J. Super. 590 (App. Div.), certif. denied, 168 N.J. 294 (2001). In that case, the Borough sued Remington & Vernick ("R&V"), a corporate engineering firm, because the firm employed a hydrogeologist, who was not a licensed engineer and who had allegedly and negligently failed to perform sufficient groundwater testing before certain municipal wells were created.

38

Id. at 592-93.  The Borough did not sue the hydrogeologist, but claimed that the engineering firm R&V, as his employer, was vicariously liable for his negligence.  Id. at 597.

The trial court dismissed the Borough's complaint because the Borough had not procured an AOM against R&V from a licensed engineer.  Id. at 594.  We reversed that determination, to the extent that the Borough's claims were founded solely upon a theory of respondeat superior or agency, and not upon R&V's alleged deviation from the standards of care of the engineering profession.  Id. at 597-99.  In particular, we delineated in Berlin this exception to the AOM requirement as follows:

> To protect against engineering malpractice claims being pressed against R & V without the required engineering affidavit of merit having been submitted, we direct that Berlin's liability claim be limited to whether R & V's hydrogeologist negligently sited the well in question and whether the hydrogeologist at the time was employed by or working for R & V.  Because no engineering affidavit has been submitted, issues such as negligent supervision or negligent hiring, or any other claim relating to the engineering firm's alleged breach of its professional standard of care, may not be pressed against R & V. Its potential liability shall be limited to responsibility under the doctrines of respondeat superior or agency.
>
> [Id. at 599 (emphasis added).]

See also Mortgage Grader, Inc. v. Ward & Olivo, L.L.P., ___ N.J. Super. ___, ___ n.7 (App. Div. 2014) (slip op. at 15)

A-4139-13T3

(reaffirming the exception from <u>Berlin</u> that "an AOM may be unnecessary in some vicarious liability contexts.").

By the same logic, an AOM from a like-licensed architect would not be necessary to support a plaintiff's claim for damages against an architect or an architecture firm whose employee or agent had acted negligently if the claim were solely based upon a theory of vicarious liability or agency. In that instance, however, the plaintiff would need to obtain an AOM from an expert with the same kind of professional license as the negligent employee or agent[13] if he or she individually was acting within the scope of a profession listed within the categories set forth in <u>N.J.S.A.</u> 2A:53A-26. <u>See, e.g.</u>, <u>Shamrock Lacrosse, Inc. v. Klehr, Harrison, Harvey, Branzburg & Ellers, L.L.P.</u>, 416 <u>N.J. Super.</u> 1 (App. Div. 2010) (requiring an AOM by a licensed attorney in a legal malpractice case brought against a law firm, in which the plaintiff had claimed that the law firm

---

[13] Since the issue is not raised in plaintiff's pleadings, we need not delineate here in what circumstances an independent contractor that is serving as a sub-consultant to a licensed professional can trigger the professional's vicarious liability under agency principles and, if so, whether and what sort of AOM(s) would be needed to sustain such claims. <u>See</u> <u>Basil v. Wolf</u>, 193 <u>N.J.</u> 38, 62-64 (2007) (generally disfavoring such liability founded upon agency or vicarious principles, but recognizing an exception for instances where the principal has exercised significant control over the sub-consultant).

was vicariously liable for the negligent conduct of an attorney employed by the firm).

## III.

Applying these concepts to the present case, we reach several conclusions. Most fundamentally, the trial court erred in finding that an AOM from a like-licensed architect was unnecessary to support plaintiff's malpractice and professional negligence claims against SOSH and Gallagher.

As our discussion in Part II, supra, has shown, we agree with the trial court that there is manifestly a degree of functional and licensure overlap between the engineering profession and the architecture profession, including the areas of design and construction contract administration that are cited in the complaint and in Beach's affidavits and report. Nonetheless, for the reasons that we have already explained, that overlap does not permit Beach, who is an engineer but not also an architect, to vouch for the merit of Cobra's malpractice and professional negligence claims it has levied against these two architect defendants.

Nor is there a basis to conclude that SOSH and Gallagher's actions and inactions here did not involve or implicate their professional standards within the practice of architecture. The only possible exception may be Cobra's claims of intentional

41

misrepresentation in Counts Eight and Nine of the complaint. We remand for the trial court to assess whether they sufficiently implicate the standards of care of an architect to require an architect's AOM. In doing so, the trial court shall consider the actual substance of those allegations and the related evidence as developed through pertinent discovery, rather than simply accept the label used for them in Cobra's pleadings. Couri, supra, 173 N.J. at 340-41.

Plaintiff's complaint does not allege claims of vicarious liability or agency,[14] so that narrow exception is not applicable. In addition, there is no need to resolve the parties' dispute over whether Beach has sufficient "particular expertise" in the design or construction contract administration of school buildings under N.J.S.A. 2A:53A-27, since Beach fails the threshold test of being a "like-licensed" professional architect.

Despite the absence of an AOM here from a like-licensed architect, we do not sustain the dismissal of Cobra's claims of

---

[14] Even if such claims had been pleaded, we recognize that a licensed architect's professional obligations to serve in "responsible charge" of certain work performed by engineers or other professionals might come into play and trigger the need for an architect's AOM. See N.J.S.A. 45:4B-3(j) (defining the concept of "responsible charge"); N.J.S.A. 45:4B-10 (addressing circumstances where engineering systems are designed or built under the "responsible charge" of either an architect or an engineer).

malpractice and negligence against SOSH and Gallagher. Instead we remand to allow Cobra a reasonable opportunity to procure a suitable AOM from a qualified architect to substitute for the AOMs that it improvidently secured from Beach. We provide that opportunity for two equitable reasons. For one thing, our precedential opinion today might not have been readily predicted by counsel, given the unsettled nature of the "like-licensed" issue. See, e.g., Shamrock Lacrosse, supra, 416 N.J. Super. at 28-29 (similarly affording relief to a plaintiff where the law had been murky about the need for an AOM). In addition, the lack of a Ferreira conference may well have contributed to Cobra's failure to supply a substitute AOM in a timely fashion.

We therefore vacate the trial court's order and remand for further proceedings consistent with this opinion. The trial court shall conduct a case management conference within thirty days, at which time the court will fix a reasonable deadline for Cobra to obtain the necessary substitute AOM and also will plan the completion of any discovery that still needs to be done.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4139-13T3